## MONTGOMERY et al. v. MORELAND.

### No. 12934.

United States Court of Appeals
Ninth Circuit.

June 29, 1953.

Rehearing Denied Aug. 21, 1953.
As Amended Sept. 1, 1953.

Charles A. Christin, San Francisco, Cal., for appellants.

Nicholas Zoller, Augustus Castro, Edwin E. Huddleson, Jr., Frank D. Tatum, Jr., and Cooley, Crowley & Gaither, San Francisco, Cal., for appellee.

Before MATHEWS, STEPHENS, and BONE, Circuit Judges.

STEPHENS, Circuit Judge.

A judgment in accord with a jury verdict was entered whereby the plaintiff, Charles F. Moreland, Sr., was awarded $10,996.41 against defendants, Montgomery Brothers. Costs were assessed at $40.62. It was alleged in the original complaint that defendants had employed the plaintiff by a contract in writing at a salary of $600.00 per month for twelve months beginning February 15, 1948; that he was wrongfully discharged September 23, 1948; and that there is due, owing, and unpaid $2,850.00, salary from date of discharge to February 15, 1949, the end of the contract year.

The complaint was amended by alleging that the contract provided in addition to the monthly salary that plaintiff would receive a bonus at the end of the year's services equal to the full year's salary, conditioned only "that the sales experience of said business for the period February 15, 1948, to February 15, 1949, showed improvement or, except for said discharge of plaintiff on September 23, 1948, would have shown substantial improvement, over the year's period preceding February 15, 1948. Said bonus is due, owing, and unpaid from defendants to plaintiff in the sum of $7,200.00 to plaintiff's further damage." Defendants appeal.

It is contended by the appellants that there was no contract in writing or otherwise for the payment of a bonus, but if there was it was not to be performed within the year following its making and that under the statute of frauds it cannot be enforced unless either it or some memorandum thereof is in writing and signed by the party to be charged. The case was filed and tried in the United States District Court for the Northern District of California, and jurisdiction is had because of diversity of citizenship: Appellants do business in San Francisco, California, and have a branch at Seattle, Washington. Appellee was to manage the northern branch. The case was tried apparently on California law.[1]

The record is incomplete. At least a part of the oral testimony given by appellee was brought up and this testimony relates to appellee's situation at the time he was employed and as to conversations between him and W. Ray Montgomery, one member of the partnership firm of Montgomery Brothers. There is no other evidence save four letters.

Mr. Moreland testified that at the time he and Mr. Montgomery met and discussed employment, he was employed by Hot Point, Incorporated, Chicago, Illinois, at a salary of $6,000.00 per year and that he earned on an average for overtime $35.00 monthly. He had been with the company for over twenty years and was due to retire at the age of sixty-five years on a pension. He was presently fifty-six years old, lived near Chicago, Illinois, with his wife and sons.

The following is from appellee's testimony. Mr. W. Ray Montgomery and Mr. Moreland discussed the question of Moreland's employment. Moreland wished to earn $10,000.00 to $12,000.00 yearly. Montgomery said they couldn't pay it as a flat salary but added, "We do have an opportunity, though, for you in the Northwest. We believe you can make that much money, but it will have to come through a system of bonuses we have in the Northwest and our other offices." Appellee testified, "Montgomery stated that the men in the top brackets, top positions in the Seattle office in 1947 and 1946, had earned a bonus equal to their salary." They had not

---

1. Cal.Civ.Code § 1624; Cal.Code of Civil Procedure § 1973.

agreed upon the sum of the salary, and as the meeting of the two was about to break up, Montgomery suggested that Moreland write him with a proposal. But before they parted Montgomery said (and here Moreland quotes Montgomery), "what about a trial period?" to which Moreland replied, "That's all right, trial period is all right for the year, for a whole year." Moreland then goes on to say (apparently from his recollection of what was said), "and that the bonus would be based on a year's employment, as long as the salary stipulated was at the rate of whatever I got." Moreland explains that his understanding of the conversation was, that all he had to do to get a year's bonus equal to his salary was to increase sales.

On cross-examination Moreland was asked, "Did you ask him again about those bonuses, how they figured them out?" to which Moreland replied, "No—he made the statement again, just as I told you, the salary and the bonuses would equal in the Seattle territory."

On re-direct examination counsel then asked Mr. Moreland to repeat the bonus conversation had at the first meeting:

"A. He said the bonus in the Seattle territory for the previous year or two had been the same amount as the key man's salary.

"Q. And he told you what? A. And I said, 'Is that bonus to be applicable in my case too, the same conditions after we come to an understanding on a salary?'

"Q. And what did he say to that? A. And that was—he said it would be figured out for you on the yearly basis."

On November 30, 1947, Moreland, in accord with Montgomery's suggestion, wrote to Montgomery saying he would accept $600.00 per month for the first year "and depend on *my successful operation* during the year to assure a *substantial bonus* at the end of a year's operations." [Emphasis ours.]

On January 5, 1948, Montgomery replied to Moreland's letter, saying: "The $600.00 per month for the first year is more in line with my thinking, and we would be willing to start on that basis, with the understanding that the results of *your leadership* in the Seattle office would determine two things: first, whether or not to *continue on this basis,* or whether we could *increase* this at the end of the first year's trial * * * [I]t will not be hard for us, nor for you, to determine the *increase* or *decrease* in the business under your management." [Emphasis ours.]

Moreland responded in writing to Montgomery's letter, saying (January 14, 1948): "I did not make any move [toward quitting his then present employment] * * * until I secured a definite proposal or acceptance of proposition put forth in my letter of November 30th. Your letter of November 5, 1948, I consider as your *definite acceptance,* and expressed desire to have me join your organization under the conditions set forth in my letter of November 30, 1947, and your letter of January 5th." Not long afterward Moreland resigned his position with Hot Point and entered upon his duties with Montgomery Brothers February 15, 1948. He was discharged without cause before the end of the trial year, i. e., September 23, 1948.

Appellee Moreland claims that he changed his position depending upon his contract with Montgomery Brothers and that in the circumstances it would be unconscionable to apply the statute of frauds. We are in full accord with this contention and cite in support thereof Seymour v. Oelrichs, 1909, 156 Cal. 782, 106 P. 88; Monarco v. Lo Greco, 35 Cal.2d 621, 220 P.2d 737; and Tuck v. Gudnason, 11 Cal. App.2d 626, 54 P.2d 88. The principle is exhaustively treated in the Monarco v. Lo Greco case with collection of supporting authority.

### Was There A Contract To Pay A Bonus?

It is implicit from the evidence and in the fact that appellee quit his Eastern position and went to work for appellants, that $600.00 per month was not satisfactory to appellee. He asked for $10,000.00 to $12,000.00 per year. Appellants could not pay that much in a flat salary. Their

868

system of bonuses was suggested, whereby appellee might earn that much. From Montgomery's conversation appellee gained the belief that if he succeeded in doing a better volume of business in the trial year the bonus would equal the salary. There is nothing unreasonable about this. The employee would be put on his mettle. If he fell behind, he would get but the $600.00 monthly salary. If he "cut the mustard" (Montgomery had expressed his confidence in that old saying), he would realize his desire to better his financial condition and the money earned would not be out of line for a manager of a business whose top men had been getting a "substantial bonus" which was equal to their salaries. If we follow appellants' reasoning that after the oral conversations, at which the bonus matter was treated as the key toward the contemplated hiring, we would read the letters that followed the conversations as completely eliminating the bonus idea, and determine that the contracting parties went back to a straight $600.00 flat salary which was much less than appellee had in mind and for which he would have to give up his steady job in Illinois.

We differ with appellants. Clearly, as we see it, the conversations and the letters constitute, together, progressive treatment as to the hiring terms. How else can the use of the language "and depend on my successful operation during the year to assure a substantial bonus * * *," make any sense whatever? How else can the expression in his letter, "I sincerely hope that we can get together on this basis" be understood than that the inadequate monthly salary would be supplemented by the bonus they had talked about?

In Montgomery's reply letter he nowhere indicates that all that had gone before was held for naught. He is answering Moreland's letter. The bonus question was settled, the salary was open. The $600.00 proposal was agreeable. The first year would tell whether this base pay would be increased or decreased and it would not be difficult to determine which. There is a finality about the letter: "* * * [U]pon your arrival in Seattle, Mr. Dolbow, who has been acting manager in

Seattle, will return to Portland and you will take over. * * * We feel confident that you will be most successful and that this *venture* will increase your earning capacity. However, this will depend entirely upon yourself and the effort put forth. Therefore, we believe that as quickly as you can arrange matters, * * * that you should make arrangements to proceed to Seattle * * *. * * * Trusting that this will be the most important and best move in your business career * * *." In the circumtances, these expressions are not consistent with a complete reversal of all that had gone before. Everything that appellee had said plainly indicated that he would not take the position at the flat salary of $600.00 per month. Appellant could not have been so definite as to direct that appellee proceed to Seattle "as quickly as you can arrange matters * * *" unless he considered the bonus question settled and there is nothing to support the idea that appellee had waived a bonus as a condition of his employment. Definitely he was agreeing in writing to employ appellee upon a monthly salary of $600.00 and a bonus. However, appellee did not go to Seattle nor did he arrange his matters with his then employers without first writing appellant that he understood he was being employed under the terms of his letter of November 30, 1947, in which he mentioned the bonus subject. And thereafter appellant wrote his acting manager at Seattle informing him that appellee would arrive and that he was to be given "all the information necessary for him to operate the Seattle office". All letters are signed by their authors.

So far as can be seen by the record, the parties at the trial went thoroughly into the circumstances of the employment. That Moreland was employed by Montgomery Brothers and that letters passed between them which resulted in the employment, is of course certain. That Moreland gave up his Chicago job and moved to Seattle by reason of the employment, is beyond question. Thus, it appears that the whole affair was laid before the court. It is true that appellee alleges a written contract, and it is conceded that a written contract for the payment of a

salary was established, but the written contract itself shows that there was something else agreed to, i. e., a bonus of some kind. And this is also shown by the oral evidence. We are convinced that the writing does not give the terms of the bonus and that oral testimony is not admissible to supply those essentials so as to establish a written contract for a bonus. However, all of the evidence taken together does establish an oral contract in all of its essentials for the payment of the salary and a bonus as testified to by Moreland.

Rule 15(b), Federal Rules of Civil Procedure, 28 U.S.C.A., provides:

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. * * *"

We hold that, while a written contract was alleged, an oral contract was proved as to the bonus and, since application of the statute of frauds would work an unconscionable injury upon appellee and bestow unjustified enrichment upon appellants, application thereof will be and is estopped.[2]

Affirmed.

---

2. Lester v. Hinkle, 1923, 193 Ind. 605, 141 N.E. 463, 465. This case goes further than we think justified, but indicates the extent the court will go to award just compensation to employees. We quote therefrom, 141 N.E. at page 465: "But a contract of present employment is not one which the statute of frauds requires to be written out at length and signed by the parties, and, where the parties have signed a contract of hiring that was indefinite and uncertain and have acted upon it until services have been performed by one party and accepted by the other, the court in which suit is brought to recover compensation may take into account all that was said and done in the matter of rendering the services, accepting them and making payments in that behalf, so far as they may tend to explain the uncertainties in the written contract, or to supply omissions therein. Pennsylvania Co. v. Dolan, 6 Ind.App. 109, 115, 32 N.E. 802, * * *; American Quarries Co. v. Lay, 37 Ind.App. 386, 389, 73 N.E. 608; Cox v. Baltimore, etc., R. Co., 180 Ind. 495, 505, 103 N.E. 337, 50 L.R.A.,N.S., 453 * * *"