[Civ. No. 9716. Third Dist. Mar. 10, 1960.]

PHYLLIS B. DENNIS, Respondent, v. ARTHUR E. OVERHOLTZER et al., Appellants.

Frank H. McAullife and Howard B. Crittenden, Jr., for Appellants.

Otto A. Hoecker and Jay M. Jacobus for Respondent.

WARNE, J. pro tem.*—This is an appeal by defendants Arthur and Orpha Overholtzer from a judgment in a declaratory relief action which ordered them to specifically perform a contract in which they agreed to sell to respondent certain real property.

The facts most favorable to respondent, as disclosed by the record on appeal, show that the property involved in this litigation is a parcel of five acres of land near Cloverdale, California, which has been improved by the construction of a sawmill on a part thereof. Appellants acquired the property in 1947 and leased a portion thereof to the defendants Bryson and Livermore. On April 15, 1952, appellants leased the remaining portion of the property, which included the sawmill, to the defendant A. R. Cornelius. By two subsequent agreements, the first executed in December of 1952 and the second in April, 1953, the Cornelius lease was extended. Both the original lease and the extensions gave Cornelius an option to purchase the leasehold. By August of 1953 Cornelius was in default of the covenants of his lease, and appellants served a notice of unlawful detainer upon him and upon a caretaker whom he had left on the premises.

Shortly thereafter Cornelius filed an action against appellants for forcible entry but dismissed the action in 1953 with-

---

*Assigned by Chairman of Judicial Council.

out prejudice before trial. On December 9, 1953, appellants leased the property (except for the portion leased to Bryson and Livermore) to W. V. Dennis, Jr., son of respondent, and W. V. Dennis, Sr., her husband. The negotiations for that lease were conducted on behalf of Dennis, Jr., by his father and Otto Hoecker, Phyllis B. Dennis's attorney in this action. During the course of those negotiations the Cornelius lease was discussed; however it does not appear that anything was said concerning its recordation.

Some time in April, 1954, appellant Arthur E. Overholtzer became involved in a dispute and litigation with his brother with whom he had been in business. He desired to commence a woodworking business of his own, and in order to provide capital for the new business he decided to sell the Cloverdale property. He first inquired of Dennis, Jr., in Cloverdale, as to whether he and his father would be interested in purchasing the property. Dennis, Jr., replied that he did not have the money but that perhaps his mother would be interested in the property. Certain preliminary negotiations then took place between Overholtzer and Dennis, Sr., as the result of which appellants, Dennis, Sr., and respondent Phyllis B. Dennis met on April 20, 1954, in the office of Mrs. Dennis in San Francisco. Appellants went there for the purpose of selling the Cloverdale property, and they took with them two title insurance policies, numbers 59027 and 62428, which they had received upon acquiring the property in question and to which the parties referred as "deeds." The two policies contained a description of the property involved in this action. At this meeting most of the conversation took place between Mr. Overholtzer and Dennis, Sr., but Mrs. Dennis was present throughout and took part in the discussion. Dennis, Sr., testified that it was his wife who agreed to purchase the property and that title was to go to her. "Q. Was that discussed?" Answer by Dennis, Sr.: "Well, I am sure it must have been because the deal was definitely between she and Mr. and Mrs. Overholtzer; in fact, I didn't have the money to purchase it." The sales price of $22,000 was fixed by Mr. Overholtzer and agreed to by Mrs. Dennis. Thereupon Dennis, Sr., prepared the following Memorandum of Sale in his own handwriting:

"April 20th 1954

"Received of Phyllis B. Dennis One Thousand ($1000.00) dollars as deposit on Realty property located in Sonoma County described in deed's #59027 and 62428 belonging to

Arthur E. Overholster [*sic*] and wife. This is to apply on purchase of property which purchase price is for a total of Twenty two thousand ($22000.00) dollars.

<div style="margin-left:2em">

W. Dennis A. E. Overholtzer

Phyllis B. Dennis Orpha Overholtzer''

</div>

This memorandum was read and signed by the appellants and Dennis, Sr., immediately. Dennis, Sr., affixed his signature as a witness. Phyllis B. Dennis, however, did not affix her signature to it until May 21, 1954. At the time the appellants signed the document they delivered to Phyllis B. Dennis the two policies of title insurance, hereinabove mentioned, and she then delivered to Arthur Overholtzer her personal check for the sum of $1,000. Being aware that the property was being sold subject to the outstanding leases of Bryson and Livermore and of Dennis, Jr., respondent requested of Overholtzer a letter directing Bryson and Livermore to pay to her the rent required by their lease. Overholtzer refused to do so until the transaction had cleared escrow. Arthur Overholtzer and Dennis, Sr., then left the office where the conference occurred and walked through the mill where there remained of a previous partnership between Dennis, Sr., and his son, three or four machines for liquidation. As they did so, Dennis, Sr., said to Overholtzer, "You can have these if it will help consummate the bargain of your [*sic*] purchase of the property."

On April 21, 1954 (the day after the signing of the memorandum of sale), respondent purchased one acre of unimproved land adjacent to the Overholtzer lumber mill at a public tax sale for $1,575. She then ordered, and personally paid for, a title search of both properties, and on May 3, 1954, California Pacific Title Insurance Company (through its affiliate Sonoma County Land Title Company) reported a cloud on the Overholtzer title in the form of the Cornelius lease and extension thereof. The title company would not insure the title against this objection. A copy of the report was furnished the Overholtzers. The recordation by Cornelius of his prior lease first came to the attention of the Dennis family through the receipt of the preliminary title report to Mrs. Dennis in May, 1954.

As soon as the question arose as to whether the recorded Cornelius lease constituted a cloud on the title, Arthur Overholtzer and his attorney, Howard Crittenden, had certain discussions with Phyllis Dennis in which they assured her that

title to the property was in fact merchantable. On May 20, 1954, Mr. Crittenden gave Phyllis Dennis a proposed form of compromise agreement, later rejected, naming her as the purchaser of the property. On May 21, 1954, Phyllis Dennis consulted Mr. Hoecker as her own attorney. On the same day she deposited her check in the amount of $21,000 in escrow with the California Pacific Title Insurance Company with instructions to pay that sum to the Overholtzers, together with any necessary prorations and expenses upon delivery to the escrow agent of a deed conveying merchantable title to the property to her. The instructions specifically stated that the Cornelius lease was unacceptable to her. One H. D. Jones, manager of the Sonoma County Land Title Company, testified that the company would have paid the prorations as requested by Mrs. Dennis. Also on May 21, 1954, Phyllis Dennis mailed to the Overholtzers her written tender of the purchase price, requesting that they deposit with the title company as escrow agent a deed made out to her conveying merchantable title, free of the Cornelius lease. On May 22, 1954, Arthur Overholtzer wrote Mr. Hoecker acknowledging receipt of the tender made by Phyllis Dennis, asserting that he had agreed to sell the property to Dennis, Sr., for $22,000 and stating:

"We are not going to start a law suit with Cornelius. I want this part of the letter understood. We will not sell our property if we have to start any kind of suit. This is final, and all the lawyers in San Francisco are not going to force me to sue anyone.

". . . . . . . . . .

"We are losing out here on a deal we had planned to go through with and which was the reason we made such a low offer on our property. If this drags out any length of time, I want it understood that the selling price might be different."

On May 28, 1954, the Overholtzers placed in escrow a quitclaim deed naming Dennis, Sr., as grantee, which they later withdrew. Phyllis Dennis treated the actions of the Overholtzers as a repudiation of their contract of sale, withdrew her money from escrow, and filed this action for declaratory relief on June 25, 1954. Cornelius, Bryson, Livermore and Dennis, Jr., were made parties to the action to establish their interests, if any, in the property. Cornelius in his cross-complaint claimed that his lease and option to buy were still in effect, but stipulated at the trial that he sought only damages for unlawful eviction and withholding of possession. The trial court held that Cornelius was in default of his lease and that

774

on the 20th of April, 1954, he had no right, title, interest or claim in or to said real property. Judgment against him was entered accordingly, and he has not appealed.

■■ Appellants first contend that the respondent was conducting business under the fictitious name of "William Bateman—Real Estate" without having complied with the provisions of sections 2466 and 2468 of the Civil Code, and hence she could not maintain this action. There is absolutely no merit in this contention. The record shows that none of the transactions or negotiations leading up to the execution of a memorandum of sale for the purchase of the property in question were carried on under the name of "William Bateman—Real Estate" or any other fictitious name. This was a transaction outside of and apart from the fictitious entity, and the trial court so found. Further, the evidence shows that the appellants knew that they were dealing with, and transacted the sale of said real property with, respondent in her name (Phyllis B. Dennis) and not in any other real or fictitious name.

It is also contended by appellants that the receipt (memorandum of sale) which they signed does not satisfy the statute of frauds (Civ. Code, § 1624, subd. 4; Code Civ. Proc., § 1973, subd. 4), in that: (a) it does not identify the vendee; (b) it does not describe the terms and manner of payment of the balance of the purchase price; (c) it does not describe with sufficient accuracy the land to be sold; and (d) it omits a major portion of the agreed consideration, i.e., the machinery.

■■ "An agreement for the purchase or sale of real property does not have to be evidenced by a formal contract drawn with technical exactness in order to be binding. A memorandum of the agreement (Civ. Code, § 1624, subd. 4) is sufficient, and this may be found in one paper . . ." (*King* v. *Stanley,* 32 Cal.2d 584, 588 [197 P.2d 321].) ■■ Upon a sale and purchase of real property a memorandum in the form of a receipt is sufficient. (*Boehle* v. *Benson,* 150 Cal.App.2d 696, 701 [310 P.2d 650].) Nor is it necessary that the plaintiff himself should sign the agreement in order to enable him to enforce it against the defendant. ■■ It is sufficient if the writing is subscribed by the parties to be charged (Civ. Code, § 1624; Code Civ. Proc., § 1973), names the parties to the agreement and contains the price to be paid, the terms and manner of payment and a description of the property. (*Finn* v. *Goldstein,* 201 Cal. 605, 607 [258 P. 85]; *Fritz* v. *Mills,* 170

Cal. 449, 458 [150 P. 375]; *Breckinridge* v. *Crocker*, 78 Cal. 529, 535 [21 P. 179].)

In the instant case we have a memorandum of contract in the form of a receipt which acknowledges the receipt of $1,000 from respondent. That memorandum is also signed by the respondent; hence the vendee is sufficiently identified in the agreement. (*Boehle* v. *Benson, supra.*)

Appellants also contend that the finding of the trial court that the terms and manner of payment were controlled by "custom" is not supported by the evidence. While there was no evidence offered in respect to the custom in such cases, we, nevertheless, can find no prejudice by reason of such finding. The memorandum of agreement was signed by the parties to be charged with the conveyance of the property and accepted by the respondent. Section 1657 of the Civil Code provides: "If no time is specified for the performance of an act . . . if it consists in the payment of money only—it must be performed immediately upon the thing to be done being exactly ascertained." It follows, therefore, that the money was payable upon delivery of a deed conveying a good title. Such unquestionably was the understanding of the parties as appears from the escrow instructions given to the title insurance company on May 28, 1954, by appellants. Further, it was appellants' duty to furnish respondent a good and marketable title. The vendor of an executory agreement for the sale of land impliedly represents that he has a good title to the land as one of the considerations inducing the vendee to enter into the contract, and that the conveyance therein agreed to be made will transfer such title. (*Whittier* v. *Gormley*, 3 Cal. App. 489, 491-492 [86 P. 726]; *Smiddy* v. *Grafton*, 163 Cal. 16, 18 [124 P. 433, Ann.Cas. 1913E 921].) Or as stated in *King* v. *Stanley, supra,* 589: "It is true there was no express agreement to furnish a certificate of title. However, it was the duty of defendant to furnish a good and marketable title . . . and the right of the vendee to receive such marketable title is not dependent upon the terms of the contract but is given by the law itself."

Appellants further contend that the agreement fails to identify the land to be sold since it refers to two nonexistent deeds. The receipt inadvertently referred to the two title insurance policies which the appellants received upon the acquisition of the land in question as deeds. Those policies contained a correct description of the land in question and we feel that the law applicable to such a situation is enunciated in

the case of *Beverage* v. *Canton Placer Mining Co.*, 43 Cal.2d 769, 774-775 [278 P.2d 694]. In that case a similar situation arose. The court said: "To satisfy the statute of frauds, the memorandum affecting the sale of real property must so describe the land that it can be identified with reasonable certainty. [Citing cases.] This is one of the most essential parts of such an agreement. [Citing cases.] Preferably, the writing should disclose a description which is itself definite and certain. Alternatively, however, a description fulfills the test of reasonable certainty if it furnishes the 'means or key' by which the description may be made certain and identified with its location on the ground. (*Gordon* v. *Perkins, supra*, 108 Cal.App. 336, 340.)

 "It is obvious in the instant case that the description in the deposit receipt is not a preferred description; by itself it is not definite and certain. (See, e.g., *Craig* v. *Zelian, supra*, 137 Cal. 105.) However, it may not be concluded that the description does not furnish a 'means or key' to identification. (See, e.g., *Preble* v. *Abrahams*, 88 Cal. 245 [26 P. 99, 22 Am.St.Rep. 301].) The applicable principle is that that is certain which can be made certain (Civ. Code, § 3538; *Preble* v. *Abrahams, supra*, 88 Cal. at p. 251; also *Tuck* v. *Gudnason*, 11 Cal.App.2d 626, 630 [54 P.2d 88]; *Mancuso* v. *Krackov*, 110 Cal.App.2d 113, 115 [241 P.2d 1052]) by additional allegations (*Marriner* v. *Dennison*, 78 Cal. 202, 207 [20 P. 386]; see also *Russell* v. *Ramm*, 200 Cal. 348, 369-370 [254 P. 532]; *Wright* v. *L. W. Wilson Co., Inc.*, 212 Cal. 569, 575 [299 P. 521]) and parol evidence in proof thereof, admitted not for the purpose of furnishing or supplying a description (*Gordon* v. *Perkins, supra*, 108 Cal.App. 336) but for the purpose of applying the given description to the earth's surface, thereby identifying the property. (*Marriner* v. *Dennison, supra*, 78 Cal. at p. 208-209; *Simpson* v. *Schurra*, 91 Cal.App. 640, 648 [267 P. 384].) Courts have been most liberal in construing executory contracts for the sale of real estate and have sought, as far as is consistent with the above established rules, to give effect to the intention of the parties in applying descriptions to property. (*Johnson* v. *Schimpf*, 197 Cal. 43, 48 [239 P. 401]; *United Truckmen, Inc.* v. *Lorentz*, 114 Cal.App.2d 26, 29 [249 P.2d 352].)"

 Appellants also contend that the memorandum omitted a major portion of the agreed consideration in that it did not include the woodworking machinery which Dennis, Sr., told Overholtzer he could have if it would help con-

summate the bargain. Dennis, Sr., testified that he promised to let appellants have the machinery but that was after the terms of the contract were settled and the memorandum drawn up. Hence it was not a part of the agreement. It amounted to nothing more than a gratuitous offer.

We conclude that the memorandum of agreement which the parties signed on April 20, 1954, satisfied the statute of frauds.

It is also contended by appellants that respondent materially altered the contract when on May 21, 1954, without their permission or consent, she signed the memorandum of agreement. By affixing her signature to said document respondent did not materially alter or change the agreement of the parties. Her signature did not change the rights or duties of the parties, or either of them. Any change made in a document after its execution, which merely expresses that which would otherwise be supplied by intendment is immaterial, and the document is in effect unaltered by it. (*Consolidated Loan Co.* v. *Harman,* 150 Cal.App.2d 488, 491-492 [310 P.2d 450] ; *Cavitt* v. *Raje,* 29 Cal.App. 659, 660-661 [156 P. 519].)

Appellants' next contention is that even assuming a valid contract of sale was executed, the performance of that contract cannot be specifically enforced because respondent has failed to prove either the adequacy of her agreed consideration or that, as to appellants, the contract was just and reasonable. Section 3391 of the Civil Code provides, in part, as follows:

"Specific performance cannot be enforced against a party to a contract in any of the following cases:

"1. If he has not received an adequate consideration for the contract;

"2. If it is not, as to him, just and reasonable."

The burden of proving the adequacy of consideration was upon plaintiff-respondent. (*Mackay* v. *Whitaker,* 116 Cal.App.2d 504, 509 [253 P.2d 1021].) "The requirement of an adequate consideration in an action for specific performance does not mean that the contract price shall measure up to the highest market value of the property, but merely that it shall be a substantially just and fair valuation under all the circumstances of the case." (*Cushing* v. *Levi,* 117 Cal.App. 94, 100-101 [3 P.2d 958].) The determination of what is an adequate consideration is a question addressed almost solely to the discretion of the trial

court. (*Cushing* v. *Levi, supra,* 102-103.) Thus the question presented is whether there is substantial evidence in the record to support the trial court's determination that at the time the contract was executed a consideration of $22,000 was adequate. (*Westwood Temple* v. *Emanuel Center,* 98 Cal.App.2d 755, 759 [221 P.2d 146].) It appears that the appellant Arthur Overholtzer was a man of wide business experience. He suggested and fixed the price. There is no evidence that at the time of the execution of the agreement he felt that the property was worth more than the $22,000 which the respondent agreed to pay him. There is no evidence that unfair advantage was taken of him. (See *Bird* v. *Potter,* 146 Cal. 286, 287 [79 P. 970].) While his letter of May 22, 1954, indicates that the value of the property was, in his opinion, greater than the purchase price, it also indicates that he was prepared to take the lesser amount because of an urgent need for capital. Under the circumstances, considering Overholtzer's desire to sell quickly and for cash, we feel the evidence is sufficient to support the court's finding that at the time the contract was executed the purchase price was just and fair. (*Cushing* v. *Levi, supra; Bird* v. *Potter, supra.*)

 In this case Dennis, Sr., knew of the Cornelius lease. His knowledge of that lease was acquired in the negotiations carried on in December of 1953 for the lease of the property to Dennis, Jr. Dennis, Sr., testified that knowledge of the Cornelius lease was not present in his mind on April 20, 1954, when he negotiated the contract of sale for the respondent. Though the interim between the two negotiations was relatively short, the testimony is credible. The court found that respondent dealt directly with appellants and that Dennis, Sr., was not her agent. At the time of transacting the lease for his son Dennis, Sr., was informed that Cornelius was in hopeless default of his lease, and nothing occurred thereafter to alter that impression. It was the recordation of the Cornelius lease and option to buy, not its existence, which caused respondent to refuse the title held by appellants. Thus Dennis, Sr., did not have knowledge legally imputable to respondent, and she did not have knowledge, either actual or imputed, or any reason to know of this cloud on the title at the time the contract was executed.

 In the absence of any express agreement on the quality of title which appellants were under a duty to tender to respondent, the interpretation is that a "marketable title"

must be transferred. (4 Williston on Contracts 2583, § 923; 50 Cal.Jur.2d, Vendor and Purchaser, § 279, p. 351; *George v. Colvin,* 98 Cal.App.2d 57, 61 [219 P.2d 64].) The fact that after defaulting Cornelius had recorded his lease with an option to buy, and that the title insurance company would not insure the title of the property in the face of this objection, was sufficient ground for respondent's demand for a title free of the cloud created by the recordation of the Cornelius lease. (*Leiter* v. *Handelsman,* 125 Cal.App.2d 243, 247 et seq. [270 P.2d 563].) Obviously Cornelius claimed some interest in the property despite his default. Respondent was not obliged to buy a lawsuit. (4 Williston on Contracts 2585, § 923.)

Appellants' tender of a deed to Dennis, Sr., on May 21 notified respondent of the defects in the title; further, their letter of May 22 to Dennis, Sr., though referring to him as the vendee, which was not the fact, was an absolute refusal to take steps to clear the defect from the title and relieved respondent of any obligation to give appellants additional time in which to do so. (57 A.L.R. 1520.)

The trial court properly prorated the rents as of May 22, 1954, and awarded as a setoff against the purchase price the amount of rent (less prorated taxes) collected by appellants up to the time the tenants were ordered to deposit rent money in court. (*Greenstone* v. *Claretian Theological Seminary,* 173 Cal.App.2d 21-30 [343 P.2d 161] ; *Lifton* v. *Harshman,* 90 Cal.App.2d 180, 182 [202 P.2d 858].)

The trial court did not err in failing to award appellants interest on the purchase price from and after May 22, 1954. Respondent cannot be charged with interest until the time comes to discharge her obligation. (*Lifton* v. *Harshman, supra,* 184.) Respondent was not obligated to tender the purchase price until she was furnished with a deed free of encumbrances or clouds upon the title.

No other points presented in the briefs require discussion. The judgment is affirmed.

Van Dyke, P. J., and Peek, J., concurred.

A petition for a rehearing was denied March 31, 1960, and appellants' petition for a hearing by the Supreme Court was denied May 4, 1960.